UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NANCY D. VINCA, <br><br> *Plaintiff*, <br><br> v. <br><br> FBA STORES, LLC; FBA DISTRIBUTORS, LLC; FBA ADVANTAGE, LLC; ONLINE AUCTION LEARNING CENTER, INC; CAPFUND ENTERPRISES INC., d/b/a CAPFUND FINANCIAL; CHRISTOPHER BOWSER; ADAM BOWSER; BRIAN SCIARA; CITIBANK, N.A; FIRST NATIONAL BANK OF OMAHA , N.A.; BANK OF AMERICA, N.A.; CAPITAL ONE, N.A.; PENTAGON FEDERAL CREDIT UNION, <br><br> *Defendants*. | Case No. 18-cv-192 <br><br> Hon. <br> Assigned District Judge <br><br> Hon. <br> Assigned Magistrate Judge <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

NOW COMES the Plaintiff, Nancy D. Vinca ("Mrs. Vinca"), through her counsel, ZAMPARO LAW GROUP, P.C., and complaining of Defendants, alleges as follows:

### INTRODUCTION

1. Defendants Christopher Bowser, Adam Bowser, and Brian Sciara operate an elaborate scheme that promises would-be entrepreneurs inside information about, training, and special access to Amazon's third-party seller ecosystem—and when their victims lack the financial wherewithal to afford the opulent pricing of their services, they offer their victims a "loan" effectuated by opening several credit cards in their victims' names for an unreasonable fee.

2. The enterprise employs a multiplicity of con artists to create the illusion that it is affiliated

with Amazon and an established lending institution. In reality, the sceme is controlled by a small group of individuals who have structured the enterprise to operate as multiple entities to frustrate and deter injured parties from seeking redress for the harm suffered in the course of the enterprise's fraudulent scheme.

3. There are three main categories of Defendants in this action: (1) the "**Charlatans,**" entities and individuals who claim to provide inside access and training regarding Amazon; (2) the "**Financers**," the entities and individuals that purport to facilitate access and provide credit to the enterprise's victims, and (3) the "**Banks**," the financial institutions where the Financers open credit cards in their victims' names without authorization to do so.

### PARTIES

4. Mrs. Vinca is a natural person who resides in the District.

### THE CHARLATANS:

5. Defendant FBA Stores, LLC ("FBA-Stores") is a limited liability company organized under the laws of the State of Nevada. According to records available on the website for the Nevada Secretary of State, FBA-Stores was organized on September 23, 2016. Upon information and belief, FBA-Stores' principal place of business is located at 293 Libbey Industrial Pkwy Suite 250, Weymouth, Massachusetts, 02189. Adam Bowser is listed as FBA-Stores' Manager.

6. At all times prior to September 23, 2016, FBA Stores was a pseudonym and mere alter-ego for the business dealings of Defendants Adam and Chris Bowser in relation to the enterprise.

7. Defendant FBA Distributors, LLC is a limited liability company organized under the laws of the State of Massachusetts. According to records available on the website for the Massachusetts Secretary of State, FBA Distributors, LLC was organized under a prior name (One Source Electronics LLC) on March 31, 2014. Its name was changed on June 24, 2016. Its address is listed

as 293 Libbey Industrial Pkwy Suite 250, Weymouth, Massachusetts, 02189. Adam Bowser and Chris Bowser are listed as its Managers.

8. Defendant FBA Advantage, LLC is a limited liability company organized under the laws of the State of Massachusetts. According to records available on the website for the Massachusetts Secretary of State, FBA Advantage, LLC was organized on June 18, 2016. Its address is listed as 293 Libbey Industrial Pkwy Suite 150, Weymouth, Massachusetts, 02189.

9. Defendant Online Auction Learning Center Inc. ("OALC") is a corporation organized under the laws of the State of Massachusetts. According to records available on the website for the Massachusetts Secretary of State, OALC was organized on December 30, 2013. Its address is listed as 293 Libbey Industrial Pkwy Suite 250, Weymouth, Massachusetts, 02189. Chris Bowser is listed as its President. Adam Bowser is listed as its Treasurer and Secretary. Chris and Adam Bowser are listed as the only two directors. According to records available on the website for the Nevada Secretary of State, OALC was registered in Nevada on August 21, 2015, with an address at 3165 N. Moapa Valley Blvd., Logandale, Nevanda, 89021. Upon information and belief, Chris and Adam Bowser founded OALC and are its majority shareholders.

10. Defendant Chris Bowser is an individual believed to reside in the State of New York.

11. Defendant Adam Bowser is an individual believed to reside in the State of Massachusetts.

### *The Financers:*

12. Defendant Capfund Enterprises Inc., d/b/a Capfund Financial ("Capfund"), is a now-dissolved corporation organized under the laws of the state of Delaware. Capfund was organized on October 22, 2013. Its address is listed as 3726 Las Vegas Blvd South Suite 3203, Las Vegas, Nevada.

13. On information and belief, Defendant Brian Sciara is Capfund's Chief Executive Officer

and founder.

14. According to records available on the website for the Nevada Secretary of State, Capfund was registered in Nevada on December 27, 2013, with its agent located at 6053 S Fort Apache Road, Suite 120, Las Vegas, 89147.

15. On its website and marketing materials[1], Capfund purports to be "a leader in the alternative financing industry and has the working capital and proven track record to help your business grow." They describe their offers there as "business cash flow loans," "merchant cash advance," "equipment loans," and "same day business loans."

16. In fact, Capfund merely opens credit cards in its victim's name so that Capfund and the Charlatans can charge their exorbitant fees to those cards.

17. Brain Sciara is an individual believed to reside in Las Vegas, Nevada.

### THE BANKS:

18. Defendant Citibank, N.A, is a national bank that transacts business in Illinois, with its principal place of business at 701 East 60th Street, North Sioux Falls, South Dakota, 57104.

19. Defendant First National Bank of Omaha ("FNBO"), N.A., is a national bank that transacts business in Illinois with its principal place of business at 1620 Dodge Street, Omaha, Nebraska, 68102.

20. Defendant Bank of America, N.A., is a national bank that transacts business in Illinois with its principal place of business at 100 North Tryon St., Charlotte, North Carolina, 28202.

21. Defendant Capital One, N.A., is a national bank that transacts business in Illinois with its principal place of business at 1680 Capital One Drive, Mclean, Virginia, 22102.

---

[1] *Available at* https://capfundfinancial.com/ last accessed December 16, 2017.

22.     Defendant Pentagon Federal Credit Union ("PenFed") is a Federally Chartered credit union that transacts business in Illinois with its principal place of business at 7940 Jones Branch Drive, Tysons Corner, Virginia, 22102.

## JURISDICTION AND VENUE

23.     This action arises under the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), common-law Fraud in the Inducement, and the Declaratory Judgment Act, 28 U.S.C. § 2201. Jurisdiction is conveyed upon this Court pursuant to 28 U.S.C. § 1331. Supplemental jurisdiction for Plaintiffs' state law claim is conveyed pursuant to 28 U.S.C. § 1367.

24.     Venue is proper pursuant to 28 U.S.C. § 1391(b).

## FACTS

**I.      Amazon's FBA Sellers Service & Third Party Seller Program**

25.     Amazon.com, Inc. ("Amazon") is a well-known website where consumers can purchase a wide range of products from Amazon and its authorized third-party sellers.

26.     Amazon's third-party seller program provides registered sellers access to Amazon's customer-base, where Sellers have the option of having their products packed and shipped by Amazon—so that customers can take advantage of their "Amazon Prime" membership which includes free two-day shipping and other perks

27.     Amazon's FBA Service has no minimum product quantity for intake into its fulfillment centers, which provides a significant value proposition for sellers with modest or fluctuating inventory. Sellers using Amazon's FBA service are charged for the storage space they use and the orders that Amazon fulfills, providing a flexible, cost-effective, and simple fulfillment solution.

28.     Amazon has developed a uniform set of contract terms, conditions, policies, and guidelines

that govern seller activities.[2]

## II. The Charlatans' Role in the Enterprise

29. Defendants Chris Bowser and Adam Bowser, both individually and through their network of affiliated companies, sell a get-rich-quick scheme that purports to provide "inside information" on and "special access" to individuals who are interested in becoming sellers through the Amazon FBA Service described above.

30. The Charlatan Defendants use Amazon trademarks to deceive their victims into mistakenly believing that the enterprise is affiliated with Amazon.

31. Each of the corporate Charlatan Defendants are owned, controlled, and/or managed by Chris Bowser and Adam Bowser. Individually and in combination, the Bowsers are the guiding force behind the Charlatans, whose activities are part of a common scheme to enrich themselves at their victims' expense.

32. The Bowsers are the leaders who drive the strategy of the enterprise and who authorize, direct and personally participate in the unlawful actions and activities of their companies alleged herein.

33. Multiple times each week in cities across the country, FBA-Stores hosts a free "LIVE Amazon Workshop" touted as a "once-in-a-lifetime opportunity" where "you will see how to: Get started selling on Amazon and Make $5,000-$10,000 in the next 30 days…Even if you have never sold anything online before[.]" FBA-Stores entices prospective Amazon Sellers to these workshops by plastering Amazon's logos on its mass marketing direct mail materials, effectively posing as Amazon.

---

[2] An overview of Amazon's FBA services, *available at* https://services.amazon.com/fulfillment-by-amazon/benefits.htm last accessed December 16, 2017.

34. The Charlatan's portion of the enterprise includes, but is not limited to, the following misconduct:

- Exploiting the Amazon brand to recruit "students" (victims) interested in becoming Amazon Sellers;
- Persuading their victims to pay for expensive workshops and training programs based on exaggerated promises of special access to inside Amazon information and guaranteed profits;
- Manipulating victims' personal credit card applications so they can pay for their costly products and services;
- Teaching their victims to open multiple Seller accounts in violation of Amazon's Seller policies;
- Instructing their victims to obtain fraudulent product reviews in violation of Amazon's Seller policies;
- Supplying fraudulent documentation to Amazon on behalf of their victim sellers to obtain approval to sell restricted product categories ("ungating");
- Selling to their victims over-priced, mislabeled, and/or counterfeit products;
- Listing mislabeled and/or inauthentic products for sale on Amazon.com on behalf of their victims; and
- Guiding their victims to the Financer Defendants and cooperating to deceive the victims into believing they are applying for a loan in a procedurally unconscionable manner.

35. In coordination and cooperation with its co-Defendants and at the Bowsers' direction, FBA-Stores uses its free presentations to convince victims to sign up for a follow-on 3-day workshop—at a cost of $995—for additional training on how to sell products using Amazon's FBA service.

36. At those workshops, victims are further encouraged to sign up for "Advanced Education Programs," which vary in cost from $26,500 to $45,490.

37. Those programs "teach" victims how to fraudulently violate Amazon's terms and

conditions[3] without getting caught by forming multiple accounts, paying for product reviews, and employing FBA-Stores to "ungate" certain product categories that are typically under heightened scrutiny.

### III. The Financers' Role in the Enterprise

38. Most of the victims cannot afford the ludicrous prices indicated above for the Charlatan Defendants' "Advanced Education Programs."

39. During its workshops, the Charlatan Defendants guide and assist its victims to laptops where they can apply with the Financer Defendants for what they call a "business loan."

40. Victims are encouraged to complete a large stack of paperwork without reading it, and are assured they're being given a great loan.

41. In reality, the Financer Defendants merely use the victims' personal information to simultaneously apply for several credit cards at once—making it difficult for credit reporting agencies and financial institutions to properly evaluate the victim for credit-worthiness.

42. The Financer Defendants often submit applications for credit cards in the victims' names that contain false signatures and inflated income figures.

43. The Financer Defendants then charge as much as $3,000 as a fee for its services.

### IV. Mrs. Vinca Falls Victim to Defendants' Scheme

44. Mrs. Vinca is a 57-year-old woman who lives in Schaumburg, Illinois with her husband.

45. She has difficulty seeing and English is her second language.

46. Due to medical bills for Mr. Vinca—and the likelihood that Mrs. Vinca's eyesight would continue to deteriorate, likely resulting in her inability to work—Mrs. and Mr. Vinca anticipated

---

[3] *Available at* https://sellercentral.amazon.com/gp/seller/registration/participationAgreement.html last accessed December 22, 2017.

financial difficulty.

47. On or about June 6, 2016, Mrs. Vinca received a direct mail advertisement from FBA-Stores regarding one of its workshops taking place near her home. A true copy of that direct mail flyer is attached hereto as Exhibit 1.

48. On July 6, 2016, Mr. and Mrs. Vinca attended the one-hour FBA-Stores "workshop" at the Hyatt Place in Schaumburg, Illinois.

49. Chris Bowser took the stage at that workshop and explained to the crowd that they could easily become wealthy, and that if they didn't have anything to sell, they could start by selling their household items.

50. Each guest, including Mrs. Vinca, received a "Conditional Guarantee" of $5,000 from Adam Bowser. A true copy of that Guarantee is attached hereto as Exhibit 2.

51. Each guest, including Mrs. Vinca, also received a certificate for a 30-minute one-on-one strategy session with Chris Bowser if they purchase the Amazon Riches Home Study System. A true copy of that certificate is attached hereto as Exhibit 3.

52. At that seminar, Mrs. Vinca was persuaded to and did make a payment of $995 to Defendant OALC to attend the three-day workshop taking place on July 15, 16, and 17 of 2016. A true copy of the information sheet for the three-day workshop is attached hereto as Exhibit 4, and a true copy of her receipt for said purchase is attached hereto as Exhibit 5.

53. On July 15, 16, and 17, Mrs. Vinca attended the three-day workshop held by the enterprise at the Holiday Inn Express located at 6600 Mannheim Rd. in Rosemont, Illinois.

54. Mrs. Vinca had fallen for the Charlatans' false promises of easy wealth and inside information on the Amazon Store, but she felt like the information she was given during the first

two days of the seminar was not sufficient for her to become a successful Amazon seller on her own.

55. At the end of the second day, Chris Bowser assigned an individual named Brad to be Mrs. Vinca's "consultant." Brad gave her a document offering her three different tiers of their "Advanced Education Program:" Gold, Platinum, and Diamond. A true copy of that sheet is attached and incorporated hereto as Exhibit 6.

56. On the third day, the seminar comprised power-point presentations on basic information regarding the Amazon FBA service. Throughout the day, Brad strongly encouraged and persuaded Mrs. Vinca that she should sign up for the Diamond-tier education program for a discounted rate of $34,995. Mrs. Vinca expressed concerns that she almost certainly would not be able to afford it.

57. Towards the end of the day Brad took Mrs. Vinca into the hallway to meet with another FBA-Stores employee named Ross Weber who was sitting at a laptop. Brad and Ross explained to her that they would guarantee her an immediate income of at least $5,000 a month if she signed up.

58. They also stated they could give her a great loan for the $34,995 that would be 0% interest for 12 months.

59. Mrs. Vinca stated she would need to discuss her financial ability to purchase the program with her husband, but that she was willing to see if she would qualify for the loan.

60. Brad and Ross responded by explaining that she could apply that day and speak with her husband that night—and that nothing would be final until she spoke with them the next day.

61. Brad then put in front of Mrs. Vinca a six-page "Engagement Agreement" on Capfund's letterhead. Brad had circled where Mrs. Vinca was to initial and complete. A true, redacted copy

of that Agreement is attached and incorporated hereto as Exhibit 7.

62. Mrs. Vinca asked Brad to explain the document to her, and he said they would explain everything the next day—once she determined whether she would be moving forward after speaking with her husband—but that she needed to fill it out now to apply.

63. Brad then flipped through the Agreement page by page and had Mrs. Vinca initial each page where he had circled. She was not given the opportunity to hold or read the Agreement.

64. On page three of the Agreement, the signature page, Brad told Mrs. Vinca to put her name, so she did. She did not believe that she was signing or assenting to the document, which is why she printed her name rather than affix her signature like she had on the other FBA-Stores documents.

65. Brad then gave Mrs. Vinca a purchase order form on FBA-Stores letterhead, indicating that she would be purchasing the Diamond package for $34,995. A true, redacted copy of that purchase order form is attached hereto as Exhibit 8.

66. Brad and Ross told Mrs. Vinca that the purchase of the Diamond package would not be effectuated unless and until Mrs. Vinca received the "business loan" from Capfund.

67. Mrs. Vinca was told she needed to make a $1,000 payment in order to lock in her "discounted" price, so she did so using her Chase credit card.

68. Mrs. Vinca then returned to the power point seminars.

69. Later that afternoon, Brad again escorted Mrs. Vinca into the hallway where Ross was sitting and explained that she had been conditionally approved for her business loan. He handed her a "Conditions for Approval" sheet, a true copy of which is attached hereto as Exhibit 9.

70. That "Conditions for Approval" form indicates that for the Agreement to effectuate—to "proceed with funding"—Mrs. Vinca would need to reduce her open revolving credit lines to

below 50% of their limits. The Agreement showed that Mrs. Vinca's Chase credit card would need to be paid down in the amount of $2,344 before any "funding" would take place.

71. Mrs. Vinca reiterated that she would need to speak with her husband to see if they'd be able to pay off the $2,344 and whether they wished to proceed with the Agreement.

72. Ross told her to contact him when she decided, and wrote his email address onto the Conditions of Approval form.

73. Mrs. Vinca then went home, discussed the matter with her husband, and decided that due to Mr. and Mrs. Vinca's various medical issues, they did not want to proceed with the program.

74. The next day, on July 18, 2016, Mrs. Vinca sent an email to Ross that she needed to cancel the Diamond membership due to her husband's medical bills. A true copy of the email thread between Mrs. Vinca and Defendants is attached hereto as Exhibit 10.

75. Mrs. Vinca did not receive a response, so she sent follow-up emails to Chris Bowser on July 19, 2016 and July 22, 2016, explaining that she canceled the program and wanted the $1,000 payment refunded to her.

76. On July 22, 2016, Ross Weber called Mrs. Vinca and told her he was going to sort everything out.

77. However, in his July 22, 2016 email, Ross indicated that he told Brian Sciara at Capfund "that you wanted [Capfund] to start raising funds."

78. Mrs. Vinca did not ever tell Ross that. To the contrary, she indicated on that telephone call that she wanted to cancel her Diamond purchase and have her $1,000 down payment refunded.

79. Mrs. Vinca immediately responded via email and clarified that she did not want to pursue any membership and that she did not have enough funds to satisfy the "Conditions for Approval."

80. Ross replied that same day and stated that he asked Capfund to "restart your funding," that Capfund "will get you somewhere around $20K with your cards as they currently are. We can wait and see what they can do and then you can make up your mind. I'm sure it will be fine."

81. Mrs. Vinca emailed Ross twice on July 25, 2016, asking for her $1,000 refund.

82. Ross replied that day stating he sent the refund request and that the money would be refunded to her Chase credit card.

83. Mrs. Vinca received her refund, and believed that the matter had been resolved and that her involvement with the Charlatans and Financers had come to a close.

84. However, on August 12, 2016, Capfund sent Mrs. Vinca an invoice via email showing that they had opened four separate credit cards in her name (so far) with the Bank Defendants for a total of $28,300, and that she was being charged $3,000 for Capfund's services. A true copy of that invoice is attached hereto as Exhibit 11.

85. Mrs. Vinca immediately replied to that email stating she had never approved the loan, did not receive final paperwork, and that she is not responsible for the charges on the invoice. *See* Exhibit 10.

86. Mrs. Vinca also wrote an email to Ross explaining that she had never authorized the opening of these cards since her Agreement with Capfund was conditional.

87. Ross replied, offering to allow her to purchase the Gold or Platinum FBA-Stores programs at the discounted rate offered to her at the three-day seminar, since she "[has] been approved for plenty of funding to do it."

88. Despite having never contacted Capfund or Brian Sciara, Mrs. Vinca received an email from Brian Sciara stating that they were not notified of her cancelation and that it "would have

been [her] responsibility to submit your cancelation directly to our company."

89. Ross then emailed and falsely stated that the reason Mrs. Vinca did not go through with the Diamond program was because she "did not think [she] would get the funding. Well, it looks like CapFund did exactly what they told you they would do."

90. Through further emails, Brian Sciara refused to give Mrs. Vinca a refund or help her resolve the unauthorized credit cards that were opened in her name.

91. In fact, Sciara and Capfund then opened another credit card in her name with Defendant PenFed and charged that card an additional $3,000.

92. Brian Sciara and Capfund had opened a total of five credit cards in her name without authorization—one account with each of the Bank Defendants.

93. Capfund had already charged its $3,000 fee to her Chase credit card, for what is listed on its invoice as its fee. *See* Exhibit 11.

94. As a direct and proximate result of the conduct of the Charlatan and Financer Defendants, Mrs. Vinca, without limitation, suffered the following damages:

95. She has had five credit cards opened in her name without authorization;

96. She was improperly charged $6,000 for services which she never consented to;

97. Her credit has been significantly damaged;

98. Lost profits from alternative, legitimate investment opportunities;

99. She has suffered tremendous amounts of emotional distress and anguish, for which she has received extensive medical treatment.

### FIRST CLAIM FOR RELIEF
#### FOR VIOLATIONS OF THE
#### RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT
#### 18 U.S.C. § 1962

### AGAINST THE CHARLATAN AND FINANCER DEFENDANTS

100. Mrs. Vinca incorporates by reference Paragraphs 1-99, above, as though fully set forth herein.

101. RICO imposes civil liability on those who violate the provisions of 18 U.S.C. § 1962.

102. Each Charlatan and Financer Defendant is a "person" as defined by 18 U.S.C. § 1961(3).

103. The collaboration of said Defendants is an "enterprise" as defined by 18 U.S.C. § 1961(4). As alleged above, the enterprise is engaged in and affects interstate commerce.

104. As alleged above, the enterprise engaged in racketeering activity by committing multiple instances of mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1961(1).

105. The conduct of the enterprise through a pattern of racketeering activity violated 18 U.S.C. § 1962(c).

106. As a direct and proximate result of Defendants' enterprise, Mrs. Vinca suffered the damages alleged above.

WHEREFORE, Plaintiff Nancy Vinca respectfully requests that this Honorable Court enter judgment in her favor and against the Charlatan and Financer Defendants, jointly and severally, as follows:

    I. Awarding Mrs. Vinca treble her actual damages in an amount to be determined at trial;

    II. Awarding Mrs. Vinca her reasonable attorneys' fees and costs as provided by statute; and

    III. Awarding Mrs. Vinca such further and additional relief and equity as justice shall require.

## SECOND CLAIM FOR RELIEF
### FOR VIOLATIONS OF THE
### ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 5/505
*AGAINST THE CHARLATAN AND FINANCER DEFENDANTS*

107. Mrs. Vinca incorporates by reference Paragraphs 1-99, above, as though fully set forth herein.

108. Mrs. Vinca is a "person" for the purposes of the Illinois Consumer Fraud and Deceptive Business Practices Act.

109. As set forth above, Defendants' conduct was in the course of trade or commerce in the State of Illinois.

110. As set forth above, Defendants' conduct toward Mrs. Vinca was deceptive.

111. As set forth above, Defendants' conduct toward Mrs. Vinca was unfair.

112. As set forth above, as a direct and proximate result of Defendants' conduct, Mrs. Vinca damages.

WHEREFORE, Plaintiff Nancy Vinca respectfully requests that this Honorable Court enter judgment in her favor and against the Charlatan and Financer Defendants, jointly and severally, as follows:

   I. Awarding Mrs. Vinca her actual damages in an amount determined at trial;

   II. Awarding Mrs. Vinca punitive damages;

   III. Awarding Mrs. Vinca her reasonable attorneys' fees and costs as provided by statute; and

   IV. Awarding Mrs. Vinca such further and additional relief and equity as justice shall require.

## THIRD CLAIM FOR RELIEF
### COMMON LAW FRAUD IN THE INDUCEMENT
*AGAINST THE CHARLATAN AND FINANCER DEFENDANTS*

113. Mrs. Vinca incorporates by reference Paragraphs 1-99, above, as though fully set forth herein.

114. As described above, the Charlatan and Financer Defendants made numerous false statements of material fact to Mrs. Vinca;

115. The Defendants knew that the statements were false;

116. The Defendants intended to induce Mrs. Vinca to act;

117. Mrs. Vinca reasonably relied on the truth of the statements made by Defendants;

118. As a direct and proximate result of Defendants' fraudulent inducement, Mrs. Vinca suffered the damages alleged above.

WHEREFORE, Plaintiff Nancy Vinca respectfully requests that this Honorable Court enter judgment in her favor and against the Charlatan and Financer Defendants, jointly and severally, as follows:

    IV. Awarding Mrs. Vinca her actual damages in an amount to be determined at trial;

    V. Awarding Mrs. Vinca her reasonable attorneys' fees and costs for Defendants' willful and wanton behavior; and

    VI. Awarding Mrs. Vinca such further and additional relief and equity as justice shall require.

**FOURTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT ACT**
*AGAINST THE BANK DEFENDANTS*

119. Mrs. Vinca incorporates by reference Paragraphs 1-99, above, as though fully set forth herein.

120. The Declaratory Judgment Act provides, in relevant part, that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be

sought." 28 U.S.C. § 2201(a).

121. Because the credit card applications and agreements were the product of fraud and never authorized by Mrs. Vinca, they are void *ab initio*.

122. As a result, any debt allegedly due from Mrs. Vinca to the Bank Defendants is void and subject to the defense of fraud.

WHEREFORE, Plaintiff Nancy Vinca respectfully requests that this Honorable Court enter judgment in her favor and against the Bank Defendants, jointly and severally, as follows:

    I.    Find that an actual justiciable controversy exists between the parties;

    II.    Find that the credit card agreements between the Bank Defendants and Mrs. Vinca are void and unenforceable due to fraud;

    III.    Any other such relief this Honorable Court finds just.

Respectfully submitted,

By:     */s/Steven J. Uhrich*
    One of Plaintiff's Attorneys

Roger Zamparo, Jr. (3123737)
Steven J. Uhrich (6310369)
ZAMPARO LAW GROUP, P.C.
2300 Barrington Road, Suite 140
Hoffman Estates, IL 60169
T. (224) 875-3202
F. (312) 276-4950
roger@zamparolaw.com
steven@zamparolaw.com

## JURY TRIAL

Plaintiff hereby demands a trial by jury for all issues so triable.

## DOCUMENT PRESERVATION DEMAND

Plaintiff hereby demands that defendants take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to plaintiff, the events described herein, any third party associated with any communication, account, sale or file associated with plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendants request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendants or third parties.